UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARY ELLEN YOUNGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 1:13-cv-00901-SEB-TAB |
| FINANCE CENTER FEDERAL CREDIT UNION, | ) |
| | ) |
| Defendant. | ) |

## **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the parties' cross-motions for summary judgment. Def.'s Mot. Dismiss or Summ. J. [Docket No. 7]; Pl.'s Br. Opp'n Summ. J & Cross Mot. Summ. J. [Docket No. 13]. For the reasons set forth below, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

### **Factual Background**

Plaintiff, Mary Ellen Youngs, is the personal representative of the estate of Roger Youngs. Compl. ¶ 2. Mr. Youngs was employed by Defendant, Finance Center Federal Credit Union (now more correctly known as Financial Center Federal Credit Union), where he served as the company's Chief Executive Officer and President. Compl. ¶ 4. While occupying that role in 2007, Mr. Youngs entered into a Supplemental Retirement Benefit Agreement ("SRBA") with Defendant, which was an amendment and restatement of a previously executed SRBA.[1] *See* Pl.'s Ex. A at 1. The SRBA terminology refers to Defendant as "Employer" and Mr. Youngs as

---

[1] The SRBA is "intended . . . [as] an unfunded, nonqualified deferred compensation agreement maintained by the Employer primarily for the purpose of providing deferred compensation for the Employee, who is a member of a select group of management . . . within the meanings of Sections 201(2), 301(a)(3) and 401(a)(1) of . . . ERISA." Pl.'s Ex. A at ¶ 1.

1

"Employee," and identifies its purpose as recognizing Mr. Youngs' value as an employee and providing him additional compensation because of that value. *See id.*

To further that purpose, the SRBA provides supplemental benefits "if the Employee is employed by the Employer as its Chief Executive Officer and President" on December 31, 2013; "[i]f the Employee terminates employment with the Employer prior to December 31, 2013 due to Disability"; or "[i]f the Employee terminates employment with Employer prior to December 31, 2013 due to his death[.]" *Id.* at 2. SRBA benefits are forfeited "[i]f the Employee's employment with the Employer is terminated for any reason other than his death or Disability or as provided in Section 4,[2] prior to December 31, 2013 . . . ." *Id.* at 3.

In 2009, Mr. Youngs and Defendant entered into another agreement titled Severance Agreement and Release of Claims ("Severance Agreement")—which refers to Mr. Youngs as "Executive" and Defendant as "Credit Union"—that identifies Mr. Youngs as Defendant's President and states that "Executive and Credit Union have agreed that it would be in the best interest of the Credit Union if Executive were to resign his position as President, effective September 22, 2009[.]" *See* Pl.'s Ex. B at 1. Mr. Youngs and Defendant "desire[d] to enter into this Agreement to provide for mutually satisfactory terms and conditions of the separation of Executive's employment from Credit Union." *Id.*

Under the terms of the Severance Agreement, Mr. Youngs agreed to release and waive Defendant's liability for potential claims arising out of discrimination statutes, including, but not limited to, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and ERISA. *Id.* at ¶ 3. Mr. Youngs was also notified of his rights under the Older Workers Benefit

---

[2] Section 4 allows for recovery of certain benefits if the Employee is "involuntarily terminated within 12 months following a Transaction other than 'For Cause[.]' . . . 'For Cause' means any intentional act of fraud, embezzlement, theft or personal dishonesty; willful misconduct; or breach of fiduciary duty involving personal profit by the Employee in the course of his employment." Pl.'s Ex. A at ¶ 4. It is not at issue in this case.

Protection Act and agreed to non-disclosure and non-compete clauses. *See id.* at ¶¶ 4, 6. Specifically under the non-disclosure clause, Mr. Youngs agreed not to disclose confidential information to which he had been privy as the company's executive; he also agreed to return:

> all credit cards and other property of Credit Union . . . [and] all Confidential Information that is in his possession or control, including any Confidential Information that is stored on any electronic equipment or device owned by Executive (i.e. laptop computer, personal digital assistant, etc) upon Executive's separation of employment from Credit Union; and to promptly return to Credit Union. Executive represents and warrants that prior to the execution of this Agreement, he returned to the Credit Union, all laptops [sic] computers in his possession that were provided to him by the Credit Union.

*Id* at ¶ 6D. The non-compete clause provides:

> E. **Non-Compete**. The Executive hereby understands, acknowledges and agrees that, by virtue of his positions with the Credit Union, the Executive has and will have advantageous familiarity and personal contacts with the Credit Union's Members, wherever located, and has and will have advantageous familiarity with the business, operations and affairs of Credit Union. In addition, the Executive understands, acknowledges and agrees that the business of the Credit Union, a financial institution, is highly competitive. Accordingly, at all times while the Executive is employed by the Credit Union and for a two-year period following the termination of Executive's employment with the Credit Union, the Executive will not . . .
>
> > i. engage in or assist another Person in engaging in, or use or permit his name to be used in connection with, any business, operation or activity which competes with any business, operation or activity conducted or proposed to be conducted by the Credit Union or which is in the same or a similar line of business as the Credit Union, at any time during the Executive's employment with the Credit Union during such two-year period following the Resignation Date; or
>
> > ii. finance, join, operate or control any business, operation or activity which competes with any business, operation or activity conducted or proposed to be conducted by the Credit Union or which is in the same or a similar line of business as the Credit Union, at any time during the Executive's employment with the Credit Union or during such two-year period following the Resignation Date.

*Id.* at ¶ 6E.

Outside of these restrictions, the Severance Agreement provides benefits under two sections. Section 7 provides for "Severance Payments," where Mr. Youngs "shall receive severance equal to his current salary for a period of 24 months . . . [which] shall be paid to Executive on Credit Union's regular payroll dates[.]" *Id.* at ¶ 7. Under Section 9, Mr. Youngs remained eligible for retirement benefits to the extent that he was already eligible for such benefits. *Id.* at ¶ 9. He could elect to maintain his medical, dental, and vision benefits; could retain his company-owned vehicle and employer-issued cell phone if he paid the associated fees; and could convert his group life insurance policy to an individual insurance policy. *Id.* at ¶ 9B. Under Section 8 of the Severance Agreement, Mr. Youngs was also compensated for his accrued but unused vacation pay. *Id.* at ¶ 8. Finally, Mr. Youngs was "not . . . eligible for any benefits under the Senior Executive Retirement Plan following his Resignation Date." *Id.* at ¶ 10.

On February 15, 2011, Mr. Youngs was declared disabled by the United States Social Security Administration. Compl. ¶ 12. Subsequently, Mr. Youngs died on November 18, 2011. Compl. ¶ 2. On October 23, 2012, Plaintiff contacted Defendant seeking at least $800,000 in benefits from the SRBA. *See* Pl.'s Ex. D. Defendant denied Plaintiff's claim on November 16, 2012. *See* Pl.'s Ex. E. On June 5, 2013, Plaintiff initiated this litigation pursuant to the Employee Retirement Income Security Act ("ERISA"), alleging that Defendant breached its contract with Mr. Youngs. Compl. ¶ 17.

## Legal Analysis

### Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "When, as in this case, the parties have filed cross-motions for summary judgment, we construe the evidence

and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Cavin v. Home Loan Ctr., Inc.*, 531 F.3d 526, 528 (7th Cir.2008) (internal quotations removed). A genuine issue of material fact cannot be demonstrated either by "the mere existence of some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Regarding materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. A dispute around a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## Discussion

Plaintiff's Complaint alleges that Defendant's refusal to pay benefits owed from the SRBA constituted a breach of contract. However, the Severance Agreement, when construed in its entirety, demonstrates that Mr. Youngs was no longer Defendant's employee after September 22, 2009. Because his employment was terminated before December 31, 2013 for reasons other than death or disability, Plaintiff is not entitled to the SRBA benefits. Accordingly, Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

**I.     Mr. Youngs was not Defendant's employee after September 22, 2009**

Plaintiff brought suit pursuant to ERISA's civil enforcement provision, which provides, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan[.]" 29 U.S.C. § 1132(a)(1)(B) (also known as ERISA § 502(a)(1)(B)).

An ERISA § 502(a)(1)(B) claim is "essentially a contract remedy under the terms of the plan." *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 695 (7th Cir. 2010) (citations omitted). The question before the Court, then, is essentially one of contract interpretation. *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). Federal rules of contract construction, not state rules, apply when a contract is interpreted pursuant to an ERISA claim. *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013); *see also Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir.1998) ("[T]he relevant principles of contract interpretation are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA.").

When interpreting contracts, "a document should be read as a whole with all its parts given effect, and related documents must be read together." *Bland*, 401 F.3d at 783. Contract terms should be given their ordinary and popular meaning, and extrinsic evidence should not be used if a contract is unambiguous. *Id.* at 784. "A contract is unambiguous if it is susceptible to only one reasonable interpretation . . . ." *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995); *see also Barnett v. Ameren Corp.*, 436 F.3d 830, 834 (7th Cir. 2006) ("But we must remember that an ambiguity is 'something that makes it possible to interpret a document *reasonably* in more than one way.'"). Whether or not a contract is ambiguous is a question of law. *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir. 1996).

If a contract is ambiguous, it is necessary to determine what type of ambiguity the contract contains. There are two types of ambiguities: patent and latent. A patently ambiguous contract is ambiguous on its face, and extrinsic evidence is only admissible if the rest of the document does not clarify the ambiguity. *See Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543

(7th Cir. 2000). By contrast, a latent ambiguity exists if a contract is facially clear—when viewed from the vantage point of an uninformed reader—but is ambiguous when applied to the particular dispute at hand. *Id.* at 542. Extrinsic evidence regarding the parties' intent is thus only admissible if the contract is ambiguous and if the ambiguities are "not disambiguated elsewhere in the document." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632–33 (7th Cir. 2004).

Turning to the case at hand, two contracts are relevant: the Severance Agreement and the SRBA. We focus on the Severance Agreement, because its interpretation dictates whether Mr. Youngs was entitled to his benefits under the SRBA after the Severance took effect. Both parties insist that the Severance Agreement is unambiguous; in doing so, however, they reach opposite conclusions about the Severance Agreement's meaning. *See* Docket No. 21 at 1; Docket No. 22 at 2. A contract is unambiguous if it is susceptible to only one reasonable interpretation, and that is the case here.[3] When looking at the Severance Agreement as a whole, we conclude it shows that Defendant and Mr. Youngs completely severed their employment relationship, and Mr. Youngs was no longer Defendant's employee following his resignation date.

The essence of Plaintiff's argument is that Mr. Youngs resigned from his position as President through the Severance Agreement on September 22, 2009, but Mr. Youngs remained Defendant's employee for two years following that date. *See* Docket No. 13 at 10–12. According to Plaintiff, Mr. Youngs was thus still Defendant's employee when he was adjudicated disabled in January 2011, triggering his SRBA benefits. *Id.* at 13. In mustering support for her claim,

---

[3] Even if the Severance Agreement is considered ambiguous, any ambiguities in the document are patent and can be resolved by looking at the document as a whole, without regard to any extrinsic evidence. *See Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir.2000). Most relevant here is a phrase seized upon by the Plaintiff to demonstrate that Mr. Youngs remained Defendant's employee, which states that Mr. Youngs cannot compete with Defendant "at any time during the Executive's employment with the Credit Union during such two-year period following the Resignation Date[.]" Pl.'s Ex. B at ¶ 6. This apparent typographical error conflicts with the rest of the Severance Agreement, which provides for termination of all employment. Construed in its entirety, then, the Severance Agreement resolves any patent ambiguities regarding Mr. Youngs employment status and demonstrates that Mr. Youngs was no longer Defendant's employee following his resignation date.

7

Plaintiff focuses on individual phrases from the Severance Agreement to argue that Mr. Youngs remained Defendant's employee; however, Plaintiff's arguments are unpersuasive. Select portions of a contract cannot be read in isolation where the document as a whole provides context that clarifies their meaning. *See Bland*, 401 F.3d at 783.

We now address the portions of the Severance Agreement that Plaintiff relies upon to support her theory that the contract did not end Mr. Youngs' employment relationship with the company. In each instance, the manifest thrust of the document as a whole undermines Plaintiff's preferred reading. We then briefly address other indicia within the document showing that the Severance Agreement did precisely as its title suggests—sever Mr. Youngs' employment.

## A. Provisions relied upon by Plaintiff

### 1. Sections 7 and 9 of the Agreement

Sections 7 and 9 of the Severance Agreement concern the allocation of benefits to Mr. Youngs. Plaintiff points to the phrase "Executive agrees that the payment and benefits as specified in Sections 7 and 9 herein shall be the only payment and benefits stemming from employment with the Credit Union to which Executive shall be entitled following the Resignation Date," Pl.'s Ex. B at 1, and argues that this language clearly refers to employment continuing beyond the resignation date. Docket No. 13 at 11. The text of Sections 7 and 9, however, indicates the end of employment—not its continuation—following the resignation date. Section 7 itself is titled "Severance Payments" and provides "severance equal to [Mr. Youngs'] current salary for a period of 24 months" to be paid on regular payroll dates. Pl.'s Ex. B at ¶ 7. If these payments were intended to be continued salary for a retained position, they likely would not be called severance payments. The payment distribution dates also would not need to be clarified, as one would already expect payments on payroll dates.

8

Section 9 provides benefits "[u]pon [Mr. Youngs'] separation of employment[.]" Pl's Ex. B at ¶ 9. The phrase "separation of employment" is quite clear. Section 9 benefits are available once the employment relationship is over. The benefits themselves are consistent with the complete end of an employment relationship. Mr. Youngs could retain his company-owned vehicle and cell phone, but he had to do so at his own expense. *See id.* at ¶¶ 9C, 9D. If Mr. Youngs had remained Defendant's employee, it seems likely Defendant would have continued to cover those costs. Both Sections 7 and 9 make clear than Mr. Youngs' entitlement to benefits "stemming from employment with the Credit Union" are benefits resulting from his previous employment relationship with Defendant, and not an ongoing employment relationship.

**2. The non-compete clause**

Plaintiff also relies on language in Section 6 of the Agreement, which contains a non-compete clause. The provision is prefaced by a statement that Mr. Youngs "has and will have advantageous familiarity and personal contacts with the Credit Union Members . . . and has and will have advantageous familiarity with the business operations and affairs of the Credit Union." Pl.'s Ex. B at ¶ 6E. Plaintiff argues that construing this provision to mean anything other than evidencing further employment would conflict with the language's ordinary meaning. *See* Docket No. 22 at 3**.** This is simply not the case. The phrase "has and will have" acknowledges that Mr. Youngs gained familiarity with clients and business relationships, and that Mr. Youngs could exploit those relationships for his own benefit if he chose. Neither the language nor its location implies that Mr. Youngs continued to be an employee.

Plaintiff also highlights phrasing later in section (i) of the non-compete clause, which prevents Mr. Youngs from using his name in connection with a business in the same or similar line of business as the Defendant "at any time during the Executive's employment with the

9

Credit Union during such two-year period following the Resignation Date," as conclusive evidence that the employment relationship continued. Docket No. 13 at 12. However, we cannot look at that clause in isolation. Section (ii) of the non-compete clause, which prevents Mr. Youngs from financing, joining, operating, or controlling a business that competes with Defendant "at any time during the Executive's employment with the Credit Union or during such two-year period following the Resignation Date[,]" uses almost the exact same phrasing, with the exception of the word "or" between "Credit Union" and "during." *See* Pl.'s Ex. B at ¶ 6E(ii). While clause (i) might suggest that the employment relationship continued for two years following the resignation date, clause (ii) uses the phrase "or" to separate employment from the two year period following the resignation date, which indicates that employment did not continue. Examination of the provision as a whole suggests that Plaintiff's preferred reading of Section (i) of the non-compete agreement rests on little more than a scrivener's error. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 575 F. Supp. 2d 892, 913 (N.D. Ill. 2008) (noting that a scrivener's error does not constitute an ambiguity); *see also Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1999).

### 3. The Agreement's use of the term "President"

Plaintiff argues that the SRBA and Severance Agreement, examined in conjunction, demonstrate that Mr. Youngs retained his position as CEO even after the Severance Agreement ended his tenure as President. First, Plaintiff notes that the prefatory clauses of the SRBA use two sets of terms to refer to Mr. Youngs. In Section 2(a), the SRBA recites that Youngs is the "President and CEO" of the company, and it provides that he will become entitled to benefits if he continues to hold those offices on December 31, 2013. Pl.'s Ex. A at ¶ 2(a). In Sections 2(c) and 2(d), the SRBA refers to him more simply as an "employee"; it provides that if his

"employment" is terminated for reason other than death or disability prior to December 31, 2013, Youngs will not receive benefits. *See* Docket No. 13 at 13**.** Second, Plaintiff notes that the Severance Agreement refers to Youngs as "President" rather than "President and CEO." *Id.* From this, Plaintiff concludes that the Severance Agreement left his position as CEO untouched, meaning that the provisions of the SRBA promising him benefits as an "employee" would remain in force notwithstanding the severance.

Besides being inconsistent with the tenor of the Severance Agreement as a whole, this reading misconstrues the SRBA's treatment of Mr. Youngs' titles with the company. Section 2(a) of the SRBA states: "On December 31, 2013, if the Employee is employed by the Employer as its Chief Executive Officer **and** President on such date, the Employer will pay the Employee the benefit . . . ." Pl.'s Ex. A at ¶ 2(a); *see also* Docket No. 21 at 12 (emphasis added). This provision is significant in two respects. First, it demonstrates the extent to which the SRBA treated "employee" and "President and CEO" as interchangeable terms—both referring to Mr. Youngs. Plaintiff's attempt to show that the SRBA establishes two "tiers" of employment stretches credulity. Second, the provision signals that the company treats "President and CEO" as a single title with respect to Mr. Youngs, not two separate offices. The use of *and* rather than *or* is unlikely to be an accident—if in the company's view Mr. Youngs happened to hold two different offices, any one of which he could lose while retaining the other, it could have said so by separating the terms with the disjunctive *or*.[4] Seen in this light, the Severance Agreement's

---

[4] We are aware, of course, that both "and" and "or" can be given disjunctive meanings in certain contexts. *See Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958). However, this seems to be a context where "and" is naturally read as denoting conjunction, and "or" would naturally be read as denoting disjunction. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–339 (1979) (on the default disjunctive reading of "or").

11

use of the term "President" rather than a more complete description of Mr. Youngs' job description appears simply as a shorthand device.[5]

**B. Additional language in the Agreement**

Other provisions of the Severance Agreement further bolster Defendant's argument that the Agreement ended Mr. Youngs' employment with Defendant. For example, the non-disclosure clause states that "upon Executive's separation of employment from Credit Union[,]" Mr. Youngs had to return any and all confidential information stored on electronic equipment owned by Mr. Youngs. Pl.'s Ex. B at ¶¶ 6A, 6D. Mr. Youngs also had to return "all credit cards and other property" of Defendant. *Id.* at ¶ 6D. This is inconsistent with the continuation of an employment relationship. Had Mr. Youngs resigned from one position but remained an employee, he would likely still require some of Defendant's property to conduct his work.[6]

Furthermore, the Severance Agreement itself states that "the parties desire to enter into this agreement to provide for mutually satisfactory terms and conditions of the separation of Executive's employment from Credit Union" and that "Executive and Credit Union have agreed that it would be in the best interest of Credit Union if Executive were to resign his position as President . . . ." Pl.'s Ex. B at 1. The Severance Agreement further provides a release of claims, notification of rights, a confidentiality clause, a non-disclosure clause, and a non-compete clause. These clauses and the document's stated intent are all consistent with complete severance of the employment relationship.

---

[5] Although we do not find its use necessary, Defendant has also provided extrinsic evidence—in the form of the Kiel and Keneipp affidavits—establishing that "President and CEO" was always a singular position in the company's lexicon. *See* Docket No. 21, Exhibits 2, 3.

[6] Plaintiff contends that the fact that Mr. Youngs continued to receive a W-2 tax form from the company is evidence that the agreement did not fully end his employment relationship. But, as Defendant points out, it is standard practice to report the severance income of a former employee on a W-2 form. *See* IRS Publication 4128. Severance payments are subject to income tax withholding and FICA tax withholding by the former employer. *See* Docket No. 21 at 16 (citing Treas. Reg. § 31.3402(g)-1; Rev. Rul. 74-252, 1974-1 C.B. 287).

When looking at the Severance Agreement in its entirety and construing all evidence in Plaintiff's favor, one cannot reasonably interpret the Severance Agreement as continuing Mr. Youngs' employment beyond resignation date. Accordingly, Mr. Youngs' employment with Defendant ended September 22, 2009.

## II.     Mr. Youngs' Resignation Prevents Plaintiff from Collecting SRBA Benefits.

Under the SRBA, Plaintiff is entitled to benefits if Mr. Youngs was "employed by the Employer as its Chief Executive Officer and President" on December 31, 2013, or if he "terminate[d] employment with the Employer prior to December 31, 2013 due to Disability" or death. Pl.'s Ex. A at 10–11. Plaintiff seeks recovery of SRBA benefits, alleging that Mr. Youngs remained Defendant's employee until the date of his disability on February 15, 2011. According to Plaintiff, because this disability occurred within Mr. Youngs' two-year employment period after the resignation date, Plaintiff is entitled to benefits under Section 2(c) of the SRBA.

This argument is untenable. As discussed above, Mr. Youngs' employment relationship with Defendant was severed on September 22, 2009, the resignation date. Mr. Youngs was no longer employed by Defendant on December 31, 2013, meaning that Plaintiff is not entitled to benefits under Section 2(a) of the SRBA. Neither is Plaintiff entitled to benefits under Sections 2(c) and 2(d) of the SRBA, because Mr. Youngs' employment was not terminated due to either disability or death. Because Mr. Youngs' was terminated for a reason other than death or disability, he "forfeit[ed] the right to receive any payments" under the SRBA. Pl.'s Ex. A at 11.

## Conclusion

Plaintiff rests her argument on individual phrases as the expense of the Severance Agreement as a whole. However, the Severance Agreement construed in its entirety shows that Mr. Youngs resigned all positions and was no longer Defendant's employee after September 22,

2009. Because the employment relationship was severed for a reason other than disability or death, Plaintiff is not entitled to SRBA benefits. Accordingly, Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Cross Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Date: 3/31/2014

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Zachary Judson Eichel
EINTERZ & EINTERZ
zach@einterzlaw.com

Michael L. Einterz, Jr.
EINTERZ & EINTERZ
michael@einterzlaw.com

Michael L. Einterz, Sr.
EINTERZ & EINTERZ
mike@einterzlaw.com

Debra Ann Mastrian
KRIEG DEVAULT LLP
dmastrian@kdlegal.com